The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Robert J. Steigman presiding. Thank you, Mr. Bailiff. First, I want to apologize to Council that we're running a little late. We had some Zoom issues and hopefully they've now been resolved. This first case this morning is 423-1531. We have John Higgins as administrator versus Ms. Leigh et al. I'll ask Council for the appellant. Please state your name. John Malone. Good morning. Council. And Council for the appellee, please state your name. Good morning. Nicholas Sejas for the appellees. So, Council, we will then proceed starting with Council for the appellant. You may proceed, sir. Thank you, Your Honor. Good morning. May it please the Court, my name is John Malone and I rise this morning on behalf of the appellant in this matter, the estate of Jasmine Malson. The underlying action that brought us before the Court today is a medical malpractice wrongful death case. And the primary issue before the Court is one of personal jurisdiction, having to do primarily with the personal jurisdiction of Illinois courts over three individuals or two individuals in one entity. Drs. Massoud, Dr. Moosley, and Washington University for their involvement in the treatment that plaintiff's decedent Jasmine Malson received while she was at a hospital in Illinois called Blessing Hospital in Quincy, Illinois. This Court has repeatedly made clear throughout its analysis of personal jurisdiction issues that each case rises and falls on a fact-specific inquiry that has to look at the specific facts underlying the case to determine whether or not those facts make for appropriate personal jurisdiction. And most recently, this Court in Allen specifically noted in the context of health care services that fact-specific inquiry is even more important, specifically stating that where the issue of personal jurisdiction arises, especially in the context of medical services, the case must be decided upon its own facts. As a result of the importance of the unique facts of this case, I think that stressing some of those facts for the Court today is critical for an appropriate determination of whether or not Illinois courts do possess personal jurisdiction over the two physicians and Washington University. The facts underlying this matter are that Jasmine Malson, a 19-year-old college student, presented to Blessing Hospital in Quincy, Illinois in September of 2020 with multiple symptoms, including chest pain, rapid heart rate, high blood pressure, and headache. She had no health history to explain any of these symptoms, and they were highly concerning. She was admitted and put under the care of an emergency medicine physician named Dr. Mark Baker. Subsequent testing of Jasmine revealed that her condition could be related to a hormone-producing tumor that was found called a phenochromocytoma. From a medical standpoint, that's not particularly important. That tumor would explain the symptoms that she was experiencing when she presented to Blessing. Dr. Baker, recognizing the seriousness of Jasmine's condition, sought out help for two things. One, he was seeking to transfer Jasmine to a facility more capable of providing her the care that she required, specifically ECMO, extracorporeal membrane oxygenation, which would have allowed for stabilization of Jasmine awaiting further treatment. Dr. Baker also reached out for help to assist with treating this critically ill 19-year-old who had presented to his emergency department. I must move on before I ask you a question. Absolutely, Your Honor. Really, would you agree the crux of this case is the content of the phone calls between Dr. Baker and the two doctors once they came online? Absolutely, Your Honor. Okay. Most certainly. I think the context of how the doctors all arrived on the phone that day is important for helping to understand why personal jurisdiction would be appropriate here. However, I do think that the contents of that phone call are definitely the focus of the determination in this case. Okay, then why don't you go ahead and explain how it is that these two doctors wound up on the call? Certainly, Your Honor. So, Dr. Baker contacted Barnes Jewish Hospital through a 800 number, the doctor's access line. And that would have allowed the staff at Barnes would then have determined the appropriate physicians to contact and put in connection with Dr. Baker. And that's what occurred here. The two physicians that Dr. Baker was put into contact with were Dr. Mohammad Massoud, who is a cardiothoracic surgeon, and who would have been ultimately responsible for putting Jasmine on the ECMO that I referenced earlier. And Dr. Amjad Mousli, who ran the critical care unit that Jasmine would have been admitted to had she gone to Barnes Jewish Hospital. If I could just interrupt for a second, because the purpose of the call was to get her transferred, correct? One of the purposes of the call was to get her transferred. Let's back up. The purpose of the call, because they were trying to decide between two different facilities, the family wanted her to go to Peoria, didn't they? The purpose of the call, undeniably, in part, was a transfer. However, again, going back to the nature of what took place during the phone call, everyone is in agreement, primarily and most importantly, the three physicians that were involved during the phone call itself, that regardless of whether or not the phone call started out as a transfer request, the content of the phone call extended well beyond a simple transfer request into a consultation that resulted in Dr. Mousli providing specific treatment instructions for Dr. Baker to carry out. You've characterized it that way in your brief, and you're characterizing it that way in your argument. I would suggest to you that the actual testimony doesn't come across that way. I'm unsure as to how Your Honor feels that I'm mischaracterizing the testimony in that fashion, the testimony of Dr. Baker, Dr. Mousli. Well, let me push up on that point that Justice Thiamin was making. You mentioned about how the facts are very important in this case, and I think that's true. And one of the questions is the nature of the communication, as Justice Thiamin was getting to. And the question is, for something this complicated, extracorporeal membrane oxygenation, ECMO, Dr. Baker was looking to have this patient transferred. And in your reply brief, you said the facts of this case are not, page 11, are not that Dr. Masood and Mousli merely accepted Jasmine's transfer and said Dr. Masood and Mousli directed Jasmine Melson's treatment while she was in Illinois. That's on page 11. On page 12 of your reply brief, you say after engaging in conversation, those doctors provided specific treatment recommendations, not directions. And on page 13, you say that the doctors knew that the treatment recommendations they were generating would be relied on and would form a basis for his treatment. Seems to me there's a very important distinction here between directions and recommendations. Which is it? You used both in your reply brief. Well, Your Honor, a couple things on that. One, oftentimes when physicians consult with each other, the consulting physician might provide a recommendation for treatment to the attending physician. Whether or not the attending physician is obligated to follow that recommendation doesn't make that recommendation any less a basis for a duty of care, for example. And so getting into whether or not this was a recommendation or an order belies the nature of the conversation that took place. And the testimony was quite clear regarding the nature of that conversation. Dr. Baker was reaching out to specialists for help with a critically ill patient and received instructions for what to do to treat that critically ill patient. Dr. Moosley. Mr. Malone, I've got to stop you there. I've read the transcripts. We've all read the record. He's calling to get the transfer done. During the process of those calls, he's also asking them for some advice on how to perhaps best stabilize her for transport. He's not asking how to treat her, and he's not asking them to take over her treatment before she ever gets there. He's simply saying, here's their situation, and do you have any suggestions or ideas on how to best stabilize her for transport? And they made some suggestions. Well, you can consider this. Of course, if you're going to do that, then you need to make sure you've got other medication available because you're going to find out rather quickly whether that's going to work or not. But this wasn't a matter of him specifically asking them how to treat her, was it? Well, Your Honor, stabilizing her in Illinois was treating her in Illinois. I don't think that there's a distinction between those two things that can be drawn. I don't quarrel with you there one bit. So that took place in Illinois. And this all took place in Illinois. And they, being Dr. Massoud and Dr. Moosley, during this phone call knew that Jasmine would receive the medication that they were indicating that Dr. Baker should administer, Esmolol, in Illinois to stabilize her. They didn't tell him to do that. They said, this is something you can consider. They said this would be, I mean, effectively, this would be an appropriate course of action from two specialist physicians with more training than Dr. Baker. And in addition to that, given the context of the nature of the discussion that was taking place, Dr. Moosley himself testified that when he's having a discussion with a physician like this, it is in the role of a gatekeeper for the ICU. There is a significant, effectively, power imbalance between the physicians on the phone making recommendations from the facility to accept the transferring patient and the doctor at the regional hospital asking for help. Counsel, isn't your position essentially arguing that by offering suggestions that Dr. Baker's request aimed at stabilizing Nelson in anticipation of transferring into Barnes-Jewish Hospital for further treatment, Dr. Moosley and Dr. Massoud purposely availed themselves of the benefit and protections of the law of Illinois? Well, to the extent that by making treatment recommendations for a patient to be carried out specifically in Illinois, they were in fact availing themselves of the protections of Illinois law. Illinois licenses physicians, for example. It is a professional obligation that physicians have in the state of Illinois to maintain licensure. ECMO is a very serious illness and the facility in Washington University in St. Louis seems to be, based on this record, a renowned one for treating that area of expertise. And it's just fortuitous the call here happened to come from Quincy, Illinois. There's no reason this call couldn't have come from anywhere in the Midwest of these doctors where some doctor in an emergency room or at some hospital diagnosed a patient with ECMO. Isn't that correct? They could call from anywhere? They could have received a call from anywhere. Just to clarify, she was not diagnosed with ECMO. He was seeking ECMO treatment for Jasmine. That was a treatment that would have been available at Barnes-Jewish Hospital in St. Louis that wasn't available in Quincy. However, the notion that he could have received this call from anywhere or they could have received this call from anywhere and that somehow makes this more attenuated or not sufficient for personal jurisdiction purposes ignores a critical fact in this. Again, while this may have started off as a phone call involving a transfer, once that phone call was involving a consultation involving the specific treatment of Jasmine Molson, based on information that Dr. Massoud and Dr. Moosley had been provided by Dr. Baker, Dr. Massoud and Dr. Moosley knew full well that they were providing treatment advice for a patient located in Illinois to be carried out in Illinois. At the time, Dr. Moosley... Let me follow up. This call could have come from anywhere. Let's assume it comes from Colorado. There's a concern about ECMO and possibly getting this person flown to St. Louis for these experts to deal with. These two doctors are taking this call because they are experts in ECMO and Dr. Baker from Quincy or any other doctor from anywhere says, I want to transfer down to Barnes-Jewish Hospital. She needs to be seen down there. And they say, okay. And he says, during the course of this transfer in preparation for it and to stabilize or deal with her condition, do you have any recommendations for me? If we were to agree with your position, wouldn't any lawyer, based upon the decision of this court, advise the doctors? No, you can't provide any recommendations at all. You're the experts on ECMO. You know all about this. And here's a doctor who has very little understanding, who's asked you for this information. But as a matter of liability, you can provide no answer and say, I'm sorry. We'll treat her when she gets here. Isn't that the result of what you're asking us to do? No, Your Honor, for a number of different reasons. And primarily that, again, as we start off, each personal jurisdiction determination is case-specific and fact-specific. If the only difference we're talking about in the hypothetical that you laid out between the current case and the hypothetical is the location of the phone call being from Colorado, I can't answer whether or not personal jurisdiction would be appropriate in that instance because there are so many other facts involved in this case. Let me be more specific. You're the lawyer for Washington University. They consult with you about the fact that they get calls like this all the time. Isn't your advice going to be doctors provide no recommendation? Otherwise, you're opening yourself up to liability. Isn't that correct? Well, whether or not they're opening themselves up to liability and whether or not they're opening themselves up to personal jurisdiction in the state of Illinois are two different questions. Well, my question is, wouldn't you as their lawyer advise them to say nothing, provide no recommendations of any kind? No, I think I would advise them that depending on the nature of the phone call, they could develop enough contact with the state of Illinois as a result of what they're doing that it could result in personal jurisdiction in Illinois. So these doctors are going to understand the nuances of personal jurisdiction. Isn't the safe course to advise them don't respond at all to a request for recommendation on how to stabilize or treat this person pending transfer? Well, I think that would run contrary to their purpose in answering the phone call in the first place. And so it again begs the question of if they're receiving phone calls for patient transfers and then providing treatment recommendations specific to patients in other states, then they should anticipate the possibility that those other states could have personal jurisdiction over them for those treatment recommendations. Let me conclude with this question, counsel. Wouldn't you concede it's a good thing for doctors who are experts in strange and serious conditions to be on call and to respond to inquiries like the one Dr. Baker made on, gee, how do you suggest we stabilize or treat this person pending transfer? Isn't that a societal good? I don't disagree that that's a societal good. However, I don't think that finding personal jurisdiction in this case creates the slippery slope that defendants have implied in their briefing that these sorts of phone calls would never take place. And this would somehow diminish the free exchange of medical information amongst physicians. I keep asking you, why wouldn't you as counsel advise these doctors make no recommendations? Isn't that what you're essentially going to require a careful doctor and medical department to do? Say nothing. It's possible that from a business decision standpoint, that may be what they're told to do. However, if they're putting doctors in a position to answer phone calls for potential transfers and give treatment advice from anywhere in the country, then they're opening themselves up to the potential for personal jurisdiction, depending on the nature of those phone calls. But that's a business decision that the defendants are making. Wouldn't you as their lawyer say, don't give any treatment advice? Wouldn't that be the safe course? No, I am unclear as to why I would say that. So they wouldn't be sued in Illinois or Colorado or anywhere else, that's why. Again, it's not a question from the perspective here. It's not a question of whether or not liability would arise as a result of the phone call. It's a question of personal jurisdiction. That's the door to liability. So you close the door by saying, don't answer questions. And that would be a business decision that I suppose they could make. Again, that would be directly contrary to the notion of having an 800 number for people all over the country to call if they're seeking – That's kind of the point. They would just stop doing that, period. You're taking it at one step. Justice Steigman's question is very simple. If we would agree with this position, then they would just stop doing the entire process, the whole referral process. You can't call us. If you want to send them, that's fine. But we're not talking to you about them ahead of time because we're not going to open up our doctors to personal jurisdiction. There's a significant difference, again, between receiving patient transfers or the free exchange of medical information about general patients and how a general patient might be treated, and the recognized difference between a consult involving a specific patient where the physicians on the other end have received specific information about that patient, and then they provide a treatment plan relating to that patient. At the request of the transferring doctor, they answer a question. They didn't say, OK, if you're going to transfer – I mean let's remember how this happened. You guys were – or I'm sorry. The hospital was waiting for a bed. So it was kind of dragging out. They were waiting for a bed to open up, and in the process, she's getting more serious. And so Baker calls back and says, hey, listen, got any ideas on how I can stabilize her for transport? And they said, well, you can try this. Of course, you've got to make sure you have this other medicine. They're throwing out possible courses of treatment that he might want to consider to try. They did not say, in order to transfer her, we expect you to do A, B, and C, or we will not accept her. There was nothing like that. Anyway, I apologize. Your time is up, I guess. Thank you, your honors. Well, you have just another few seconds before we get – your time will be up, I think. OK, go ahead. I didn't see the – I thought the clock was up. Well, I guess – well, it's up now. We'll give you an opportunity, Mr. Malone, to address this again in rebuttal. Thank you. OK. Counsel for the appellee, Mr. Counselor Penal, see this? Thank you, your honor. How's your name pronounced, sir?  Sejas. I'm sorry. Go ahead. May it please the court. The trial court committed no error here. It properly dismissed the claims against three Missouri defendants, finding Plaintiff failed to meet her burden of stabbing on a prima facie basis for exercising personal jurisdiction. This court should affirm for three reasons. First, there cannot be specific jurisdiction. Whereas here, the Missouri providers have not reached into Illinois, but the patient, by way of her position, is the one reaching into Missouri. Second, there is no basis in which the trial court can exercise general jurisdiction over the Washington University, given the near ironclad rule that a corporation is only at home in its place of incorporation and its principal place of business. And third, even if the trial court could exercise personal jurisdiction over the Missouri defense, which it cannot, the Missouri defense would still be entitled to dismissal because providing an informal opinion to another physician at that other physician's request does not give rise to duty of care. Turning to specific jurisdiction, as the court knows, for the exercise of specific jurisdiction to comport with due process, the defendant's conduct and the connection with the foreign state must be such that he should reasonably anticipate being hailed into court. In defining that, the United States Supreme Court has explained that unilateral activity of a third party is not a sufficient basis for a non-resident defendant to be hailed into jurisdiction. There must be some act by which the defendant purposely avails itself of the privilege of conducting activities within the state. There is a long line of Illinois appellate court opinions cited in the briefing that have looked at this rule, examined this rule, and applied it in declining to exercise personal jurisdiction over non-resident health care providers who did not reach into Illinois. And I want to address a couple of those in particular. Allen v. Missouri Baptist Medical Center held that the acceptance of an Illinois patient does not give rise to specific jurisdiction over an out-of-state health care provider and more important than its holding is the rationale of the court. It was the court explaining that out-of-state health care providers' reputation, expertise resulting in patient referrals cannot be enough to establish personal jurisdiction. Instead, the inquiry must be whether that defendant directed its activities at the foreign state. And the court then goes on to say there's no difference between a patient getting their car and traveling to Missouri and seeking treatment in Missouri and a transfer of a patient orchestrated unilaterally by their health care provider. In both cases, the out-of-state health care provider has not reached into Illinois, but the patient, whether on her own by traveling or from a phone call from her physician acting on her behalf, has reached out into the out-of-state form for treatment. This same rationale is applied in... Ms. Sayles, can I ask you a question, please? Sure. Although that might be part of Mr. Malone's argument, I think the real crux of it is what we've been discussing with him this whole time. I think the point of his argument is that it may not start out in a situation where there's personal jurisdiction, but it may develop within the context of how the doctors communicate with each other and what the nature of the communication is and the result or effect of the communication. That may then lead to personal jurisdiction. Could you address that point, please? I can, Your Honor. As a preliminary matter, the physician who recommended the esmolol, in this case Dr. Mooslake, does not hold clinical privileges to practice medicine at Blessing Hospital. This means that he had no authority to order any medication be administered to Ms. Smallson or any other patient at Blessing Hospital. I would disagree that in this case the substance of the conversation developed into a situation where it's a consultation, given the fact that the recommendation that was made here by Dr. Mooslake, Dr. Baker was free to implement or not any advice or recommendations provided during that phone call. But regardless of whether one wants to characterize that conversation about esmolol as an instruction or a recommendation, I agree with the court that that is an important distinction. But regardless of how you characterize it, the Fifth District has already rejected a very similar argument on Traynor. There, the plaintiff traveled to Missouri for her medical appointments, had blood drawn, and then she received a phone call at home from the doctor. And in that phone call conversation, the doctor instructed the patient to take more warfarin, a blood thinner, and advised her to return to the defense office in Missouri in the month for follow-up. And the court basically said, you know, it doesn't matter whether it's an instruction or not. The important thing is how that conversation occurred in the first place. The defense chose to advise the patient in that case, and a solitary phone call can't be equated with the defense having voluntarily invoked protection and benefits of the laws of the state of Illinois. The same reasoning applies here. As an untrainer, where the patient could have returned the call from any number of jurisdictions, including Illinois, Drs. Mooslake and Massoud could have received a phone call from any number of jurisdictions seeking to transfer to Barnes-Jewish Hospital. There's testimony in this case that Barnes-Jewish Hospital accepts transfers of patients from all 50 states. So just as the patient untrained sought out the Missouri physician, the patient here, by and through Dr. Baker, sought out Barnes-Jewish Hospital's expertise. So that decision was not based on any prior relationship Dr. Baker had with any Missouri provider, but instead his familiarity with their expertise. So it should make no difference whether Dr. Mooslake suggested during the transfer discussion that Dr. Baker tried the medication. In any event, just providing recommendation and a question from a colleague, a colleague who is looking for advice on how he could go about stabilizing the patient for a transfer doesn't give rise to consultation anyway. Normally... What if the doctor who makes the call says, look, I have no experience with anything like this. I have no idea how to be treating this person. That's why we need to transfer her. But until then, I need to know how we can keep her alive. I need your direction on how to keep her alive. I don't have any idea what her course of treatment should be. I think even in that situation where the doctor who's requesting advice has no experience whatsoever, I don't think that changes the equation, that it is not a consultation. It is an informal request by an Illinois physician asking for advice on how to go about stabilizing the patient for transfer. So regardless of the expertise levels of the respective physicians on either side of the phone call, the question, the important question is, how did that phone conversation occur in the first place? And it would be different had, for instance, there been some contractual duty on the receiving physician's end to render that advice. There are cases in which, for instance, there's a contractual arrangement between the emergency room physician and the specialist. That's not the case here. There is no relationship between Dr. Mousselet, Dr. Massoud, and Dr. Baker. The only reason that they ended up speaking to Dr. Baker that day was because Dr. Baker called a 1-800 number, and Dr. Mousselet and Dr. Massoud just happened to be the on-call physician for the service of the Small Cemetery Choir. So to the court's question, I don't think it matters what the respective level of expertise is on either end of the phone call. The important distinction is, how did that conversation occur in the first place? In this case, it was related solely to the fact that the Illinois physician, on behalf of the patient, reached into the state of Missouri seeking advice, and in the course of that conversation, there was advice given that Dr. Baker was free to utilize or not, regardless of the level of expertise. And that's all the question. Regarding ECMO expertise and facilities in the nation that provide the expertise to treat these people like Washington University, is there any indication in the record how many other such facilities there are in the nation? Not specifically, Your Honor, but the question asked of Dr. Baker, I believe, of what tertiary care centers he would consider calling in a situation such as this. And he mentioned there were a couple, Farnsworth Hospital being, in his mind, the one that had the highest degree of expertise. He did mention Peoria as a possibility. And as the court noted in prior questioning, that was one of the hospitals that was being considered to send the patient to. And in fact, the one that the patient's family had referred. Which also raises another interesting point, which is in the course of this, to show that this is simply a recommendation, not a consultation, when that discussion was had between Dr. Baker, Dr. Moosley, and Dr. Massoud, in which the recommendation was made, after that phone call had ended and everyone was off the line, there was a delay in getting a bed available. And when a bed did become available, at some point after that conversation, the operator for the 1-800 number calls back Blessing Hospital, says there's a bed available, only to be told, oh, never mind, we've decided to transfer the patient to Peoria instead. So that just goes to show that there was no consultation, there was no direct patient-physician relationship at that point in time. So to answer your honest question, I don't think there's a specific notation in the records to how many hospitals in the country are able to do this. However, the evidence in the record does establish that it is a highly specialized type of care for patients who are in the most dire of situations, like Ms. Molson was. And the options available to Blessing Hospital as to who can provide that type of care are limited to places like St. Louis, Peoria, and Chicago. And the options available at that point are very, very narrow. So I have a question. Your response to my questions, other questions, seem to have drawn a distinction between a consultation on one hand and recommendations on the other. And you're saying that this wasn't a consultation out of which perhaps liability could arise, it instead was just recommendations. Playing devil's advocate for a moment so that we can better understand this distinction that you're drawing. What, in your judgment, would possibly have transformed this conversation that you deem to be just recommendations not being a basis for liability into a consultation whereby Dr. Mousselet and Dr. Massoud might have stepped over the line, so to speak, and now this is in a consultation for which liability might arise? I think the distinguishing fact on what changes a conversation from an informal opinion to a consultation is whether the doctor who's giving that advice is contractually obligated to render that advice. For instance, there are situations in which an emergency room doctor will call a doctor who's quote, unquote not qualified for the hospital, right? A specialist, a neurologist who's under contract with Blessing Hospital can be on call at certain hours of the day or night. In that situation, it is the contractual duty, the job of the consultant to receive calls in the middle of the night and answer questions and direct activity, whereas here, unlike that type of case, Dr. Mousselet, who's the one who gives that recommendation, isn't even on staff at Blessing Hospital, so he doesn't have the ability in terms of just the privileges at the hospital to order Dr. Bakers to do anything. So I think that's the distinction, Your Honor, is whether or not that the physician who's making that advice has a contractual obligation, a job duty to render that advice as opposed to a situation like this where it was a random attenuated call and the only reason that call was being made in the first place was to seek a transfer and in that conversation there was advice rendered. So I think that's the difference. And so also, you heard my questions to Mr. Malone, where I was asking about what a lawyer for Washington University might advise, especially if we were to agree with Mr. Malone's argument and reverse this judgment. To what extent is there a concern that a lawyer, and lawyers tend to be on the careful side when advising their clients to avoid liability and potential expensive litigation, would say to these doctors and others and Washington University staff, you get these phone calls and do not make any recommendations to people who are just calling, other physicians who are, with whom we have no contractual relationship because it would be a very bad thing. How realistic is that concern? It's a very realistic concern, Your Honor. And that absolutely would be the advice from lawyers to Washington University. It would be in a situation in which you receive a request for a transfer. If you could be hailed into court just for giving recommendations during that call as part of how to stabilize, then the recommendation to Washington University and its doctors would be to do nothing other than say, or not, and not to render any advice whatsoever. In fact, that's an important public policy consideration that this very court has addressed years ago in Reynolds v. Decatur. It's cited in our briefing, and that's a case we cited in retrospect to whether there's a duty of care, but it's a similar situation in the court in that case, where I want to say, to hold otherwise, to hold that a phone call where there's advice given would have a negative effect upon the practice of medicine, would stifle communication, education, professional association, all to the detriment to the patient. The likely effect in adopting plaintiff's argument would be that such informal conferences would no longer occur. That would inhibit the exchange of information and expertise among physicians who would not benefit the medical profession or person seeking treatment. It is a very real concern that the court recognized in Reynolds, and that same concern applies just as much here in that if this court were to adopt a plaintiff's position, then there would be a chilling effect, and specialists across the country would be told or instructed in all likelihood, when you have a request like the one that Dr. Museli-Masoud got here, don't do anything other than accept or deny transfer and then refuse to provide any advice whatsoever, and that would have a chilling effect on the practice of medicine. And so, Your Honor, I don't think, you know, just to wrap it all up, I don't believe there's a specific basis in this case for the court to exercise jurisdiction, and even getting past that, even hypothetically, if they could, which I don't believe the trial court can, we've cited the Reynolds case. I also believe that there is an issue or lack thereof, rather, of a duty in this case, that was, you know, there was no patient-physician relationship and therefore no duty of care, and that's especially important to consider given the fact that the timing of this, you know, after that recommendation was made, as I discussed previously, there was a call back when a bed became available only to be told, actually, never mind, send the patient to Peoria. If, in fact, there was a patient-physician relationship at that point in time, not only is there no personal jurisdiction in this case, but there also was no duty of care because no patient-physician relationship had arisen at the point in time that that conversation occurred. Say, Allison, in the few minutes you've got remaining, do you want to discuss the general jurisdiction question with regard to Washington University and WUPI? Absolutely. There is no basis to exert general jurisdiction over Washington University. As the court knows, the New York ironclad rule is looking at whether it's essentially at home in the form state. And to do that, you look at where the corporation is organized, where it's placed in businesses. It's undisputed in this case the location of both for Washington University is the state of Missouri. Discussion should end there because this is not the exceptional case. The plaintiff's strains argue that this perhaps could be or should be the exceptional case. And in doing so, there's a subsidiary of Washington University called WUPI. Washington University and WUPI are two separate corporations. And plaintiff cannot claim that the actions of WUPI are attributable to Washington University. And it's important to note at the trial court level, plaintiff never acknowledged or addressed the legal requirement that for WUPI's context to be imputed to Washington University, there had to be substantial control exerted over WUPI and the context of WUPI should be imputed because there had been some clear or deliberate attempt to affiliate Washington University and WUPI beyond just simple common ownership. But because plaintiff's making that argument the first time on appeal, that argument need not be. And so WUPI's context with Illinois cannot be imputed to Washington University. And then the two other things to sum up that the plaintiff raised in their brief on general jurisdiction are the fact that Washington University comes from Illinois, or from Illinois to its campuses, all of which are located in Missouri. That is of no import here. The case law is quite clear that average solicitation to do business in a state like Missouri simply is not a basis to exert general jurisdiction. And lastly, they raise the fact that Washington University has entered into a handful of agreements to lease physicians, but simply doing business is not enough to render general jurisdiction. If you look at the situation as a whole, when you look at the context here, 98% of Washington University's revenue is from business conducted in Missouri. So whatever little fraction of its revenue is a result of activity in Illinois is minuscule. So for that reason, Your Honor, there is no general jurisdiction for all the reasons discussed, unless the court has questions we respectfully request that the Oral Circuit Court granting the motion to dismiss be affirmed. Thank you, Counsel. Mr. Malone, any rebuttal, sir? Yes, Your Honor. Thank you. No points. In regards to the notion that an attorney for Washington University would provide advice to not engage in these sorts of discussions if the court were to reverse the lower court here and find personal jurisdiction, that advice would be effectively the equivalent of telling Washington University that you have to change your entire business model. Washington University and Barnes-Jewish Hospital by extension directly benefit from the business model that they maintain, wherein they receive patient transfers from across the country. And so if they wanted to change their business model to change how they were exposed to liability, that's a choice that they could make. But that's their choice that they're putting themselves in. I want to make sure I understand what you're saying when you say they change their business model. Why would they have to change their business model of accepting transfers for people with ECMO and other significant cases beyond the can of Quincy, Illinois to handle them? All I'm suggesting is really in your favor would tell the doctors to provide any advice or recommendations regarding the treatment of the patient before they get to Washington University or to facilitate the transfer. If that were to be the case, how does that affect the business model of accepting people to come to Washington University in St. Louis? And the distinction to be drawn there, Your Honor, I think is a good one because I think it goes to this notion that there would be somehow a chilling effect in regards to general communication about patients or for the benefit of patients. We're not talking about a situation where there was a general conversation about a patient or a situation that was confined solely to a transfer request. We're talking about a situation where physicians engaged in a detailed discussion about a patient who understood the esmolol if not for the conversation he had with Dr. Moosley. Dr. Moosley and Dr. Massieu testified that they understood the esmolol would be administered pursuant to their recommendation to Dr. Baker. Defendants' reliance on Allen and Clemens I think kind of underlies the significant factual difference between those cases where personal jurisdiction was not found and in this case where personal jurisdiction would be appropriately found. In Clemens, the Court of Appeals specifically noted in its opinion that the physician at issue had no input in treatment that took place in Illinois. None. That's completely different from the case here where it's undisputable that the physicians at issue had input in the treatment that took place in Illinois. Let me ask you another question. If I understand correctly, you're citing a recent decision of this court and Blagdon v. McMillan as supporting your position as why the concerns expressed in the Reynolds case don't apply. Do I understand that correctly? Well, the concerns expressed in the Reynolds case in regards to... My question was that you're citing the Blagdon v. McMillan case in support of your position here. Have I got that right? I'm unsure, Your Honor. I would have to review the Blagdon decision. Well, I apologize then. Go ahead and you can forget about my inquiry and you can continue with your argument. And I apologize, Your Honor. It may have just been that I was a little bit confused by your question and that it was on me. Ultimately, there is this notion that finding personal jurisdiction here would create a sea change in how personal jurisdiction is evaluated in these cases. It would not. I direct this court to look at its decision in Coastal v. Pincus where under very analogous circumstances where the actions taken by the prospective defendant who was ultimately determined to be subject to personal jurisdiction in Illinois were directly analogous to the actions taken by Dr. Masood and Dr. Moosley in this case. They received information about a patient that they knew was in Illinois. They formulated a treatment plan for that patient that they knew was in Illinois, that they knew an Illinois physician would carry out in Illinois. These facts are directly analogous to Coastal where this court found personal jurisdiction. Furthermore, ultimately, there's been no discussion here. There's been a heavy focus on Washington University and the doctors and the impact there, but there's been no focus on the fact that Jasmine Molson sought treatment in Illinois. Her family, as it's been referenced, continued to try to seek treatment in Illinois. That's directly contrary to the case law cited where the patients initially sought treatment in Missouri. Your time is up, counsel. Thank you. And I thank counsel for the appellee as well. The court will take this matter under advisement and stand in recess.